**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

CIVIL ACTION NO. 18-97-DLB-CJS

ADAM K. WAD                                                                                        **PLAINTIFF**

v.                                    **MEMORANDUM OPINION AND ORDER**

AMAZON.COM SERVICES, INC.                                                      **DEFENDANT**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

     This employment-law matter is before the Court on Defendant's Motion for Summary Judgment (Doc. # 32), Motion for Leave to Exceed Page Limit (Doc. # 30), and Motion for Leave to File Exhibits Under Seal (Doc. # 31). The Motions have been fully briefed, (Docs. # 37 and 41),[1] and are now ripe for the Court's review. For the reasons stated herein, the Motions are **granted**.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

     Plaintiff Adam Wad began working for Defendant Amazon.com Services, Inc. ("Amazon") in 2008 as a Warehouse Associate at the Amazon Fulfillment Center in northern Kentucky. (Doc. # 38-1 at 93:6–9). Wad, a Syrian refugee, was born on March 22, 1956. *Id.* at 15:9–11; 18:5–8. On January 15, 2010, Wad became a naturalized United States citizen and legally changed his name from Ahmad Abdul Wahid to Adam Kamel Wad. (Doc. # 37 at 2). Throughout his employment at Amazon, however, Wad's employee identification badge listed his name as Ahmad Wahid. *Id.*

---

[1] Plaintiff did not file a response to Defendant's Motion for Leave to Exceed Page Limit (Doc. # 30) or Motion for Leave to File Exhibits Under Seal (Doc. # 31).

As a Warehouse Associate, Wad's job duties included "pack[ing] and ship[ping] customer orders," "pick[ing] up customer orders on all levels of a multi-level mezzanine," and "adher[ing] to strict safety, quality, and production standards." (Doc. # 32-3 at 1). Wad was required to lift, move, push, and pull "product up to 60 pounds during shifts between 8 and 12 hours long." *Id.* From 2008 to 2014, Wad worked at Amazon without serious incident. (Doc. # 32-1 at 6). During that time, the majority of Wad's performance reviews "reflect positive feedback, complimenting Wad on meeting or exceeding performance standards," although "his record also demonstrates policy violations and insufficient performance." *Id.*

## A. The Injuries

On July 17, 2014, Wad was injured in a car accident unrelated to work. (Doc. # 37 at 3). As a result, in May 2015 and January 2016, Wad took medical leave from Amazon under the Family and Medical Leave Act ("FMLA") to have rotator cuff surgeries to address injuries caused by the car accident. *Id.* at 3–4. Wad returned to work after each surgery. *Id.* Following his second surgery, Wad returned to work in July 2016 with a written doctor's evaluation stating that he had "no limitations." *Id.*

Later that year, on November 10, 2016, Wad suffered a workplace injury when he was struck in the back by a rebin cart—a large cart used by employees to move orders around the Amazon facility. (Doc. # 32-1 at 7). The injury was captured on video. (Doc. # 32-12). The video shows Wad being struck in the back by the cart; Wad then clutches his lower back, staggers a few steps, and falls to the ground. *Id.* The parties dispute what happened after Wad fell to the ground. *Compare* (Doc. # 32-1 at 7), *with* (Doc. # 37 at 4). Wad claims that he was semi-conscious and left unattended for "several minutes"

while other employees "simply stared at Wad on the ground, not calling for help, despite having radios and phones." (Doc. # 37 at 4). Wad also alleges that he heard employees making jokes at his expense while he was on the ground. *Id.* In contrast, Amazon claims that the employee who struck Wad with the rebin cart "immediately checked on [Wad], and multiple supervisors and associates also checked on [Wad] right away." (Doc. # 32-1 at 7). While the camera's view of Wad when he was on the ground is blocked by several rebin carts, the video does show that within two minutes at least five different employees went over to the area where Wad fell. (Doc. # 32-12). The video, however, does not have sound and ends before Wad gets up from the floor. *Id.* The parties agree that eventually Wad got up and went to the onsite medical clinic where he was treated with ice and ibuprofen. *Id.*; (Doc. # 37 at 4). Wad returned to work the next day after a doctor at St. Elizabeth Hospital concluded that he could return to work with no restrictions. (Doc. # 32-18).

### B. The Verbal Altercation

Separate from the November workplace injury, on March 9, 2017, Wad got into a verbal altercation with Barney Molnar, a Loss Prevention Manager at Amazon. The parties dispute how the altercation started. Wad claims that he was walking down a hallway in the facility when Molnar "stopped him and aggressively demanded to see Wad's employee ID badge." (Doc. # 37 at 5). Wad admits that his ID badge was in his pocket at the time, which is a violation of Amazon's policy. *Id.* Wad claims that he showed Molnar his ID badge and told Molnar that he would retrieve his lanyard so he could properly display his badge from his car at lunch. *Id.* Wad alleges that Molnar then became aggressive when he heard Wad's Syrian accent and saw that the name on his

identification badge was Ahmad Wahid. *Id*. According to Wad, Molnar "point[ed] his right hand and index finger at Wad, and . . . began to demand who Wad was and why he was in the facility." *Id*. Wad says that he "put his hands in the air, told Molnar he did not want to fight, and said he was an American citizen, an educated man, and a 10-year Amazon employee." *Id*. Wad claims the two men then began to walk to a security desk to retrieve a lanyard for Wad to properly display his identification badge. *Id*. at 6.

Alternatively, Amazon claims that Wad was the initial aggressor. According to Amazon, Molnar "routinely reminded associates to display their identification badges correctly," so when he did not see Wad's badge when he passed him in the hallway, Molnar "signal[ed] to Wad that he should have his badge displayed." (Doc. # 32-1 at 9). After Wad told Molnar that he would retrieve his lanyard from his car during lunch, Molnar told Wad "that the badge had to be displayed at all times and directed Wad that he could obtain a replacement lanyard or belt clip at the security desk." *Id*. Amazon claims that Wad became "more and more upset" because he "felt that Mr. Molnar failed to show him respect as a veteran associate" and, without provocation, Wad asked Molnar if he wanted to fight. *Id*. When Molnar appeared puzzled, Wad "backed away and said he did not want to fight." *Id*. The two men then began walking towards the security desk. *Id.*

The parties' stories somewhat converge when the two men reached the security desk and came into view of a security camera. Wad admits that he waived his hands and pointed at Molnar, (Doc. # 37 at 7), which is corroborated by the security video, (Doc. # 32-21). The video also shows that Wad approached Molnar several times. *Id.* Furthermore, Wad admits that he "yell[ed] at Molnar that Molnar needed to address him with respect" and "yelled that he was an American citizen and was allowed to be in the

United States." (Doc. # 37 at 7). Wad argues, however, that he "never made any direct threats towards Molnar or anyone else" nor "threatened to fight." *Id.* or 6. The video shows Louis Frommeyer, another Amazon employee, physically placing himself between Wad and Molnar presumably to try and calm Wad down and de-escalate the situation. (Doc. # 32-21). During this time, Molnar is seen handling shipping boxes on the other side of the security desk, away from Wad. *Id.* After about two and a half minutes, Wad left the security-desk area and presumably returned to work. *Id.*

Molnar reported the altercation with Wad to Human Resources Business Partner Miller Casale and Loss Prevention Specialist Lucas Jacob, and Amazon suspended Wad while Casale and Jacob investigated the incident. (Doc. # 32-1 at 10). Ultimately, Amazon concluded that Wad violated its Workplace Violence Policy and Standards of Conduct. (Doc. # 32-23). On March 10, 2017, Amazon terminated Wad's employment. (Doc. # 37 at 7). Molnar, however, was not disciplined after the altercation with Wad. *Id.*

On September 5, 2017, Wad filed a claim with the Equal Employment Opportunity Commission ("EEOC"), claiming that Amazon discriminated against him based on his age and national-origin. (Doc. # 32-27). Wad alleged that Amazon failed to provide him with adequate medical care after his workplace injury on November 10, 2016 and wrongfully terminated his employment following the March 9, 2017 altercation with Molnar. *Id.* The EEOC issued Wad a Notice of Right to Sue on March 9, 2018,[2] (Doc. # 1 at ¶¶ 9–10).

---

[2] Also on March 9, 2018, Wad applied for Social Security Disability Insurance ("SSDI") benefits. (Doc. # 32-1 at 11). The SSDI "program provides benefits to disabled persons who are 'unable to do [their] previous work' and 'cannot . . . engage in any other kind of substantial gainful work which exists in the national economy.'" *Verhoff v. Time Warner Cable, Inc.*, 299 F. App'x 488, 497 (6th Cir. 2008) (alterations in original) (quoting 42 U.S.C. § 423(d)(2)(A)). In his SSDI application, Wad alleges that he had to stop working because of his "physical and/or mental conditions." (Doc. # 32-25). Wad states that his disability began on March 10, 2017, the day that he was terminated from Amazon. *Id.* Wad alleges that his physical disability affected his lifting,

On June 6, 2018, Wad filed this lawsuit.  (Doc. # 1).

Wad brings six claims against Amazon: (1) national-origin discrimination "throughout his employment," (2) wrongful termination based on national-origin discrimination, (3) age discrimination "throughout his employment," (4) wrongful termination based on age discrimination, (5) unlawful interference with FMLA rights, and (6) intentional infliction of emotional distress ("IIED").  *See generally* (Doc. # 1).  In its Motion for Summary Judgment, Amazon argues that Wad's claims "have numerous fatal flaws" and asks the Court to enter summary judgment in its favor on all counts.  (Doc. # 32-1 at 1).

## II.    ANALYSIS

### A.    Motion to Seal and Motion to Exceed Page Limit

As an initial matter, because Wad failed to respond to Amazon's Motion for Leave to Exceed Page Limit (Doc. # 30) and Motion for Leave to File Exhibits Under Seal (Doc. # 31), Wad has waived his right to oppose these Motions.  *See Humphrey v. U.S. Attorney Gen.'s Office*, 279 F. App'x 328, 331 (6th Cir. 2008).  Because Wad has waived his opposition and because the Court has reviewed the Motions and finds them to be reasonable, Defendant's Motion for Leave to Exceed Page Limit (Doc. # 30) and Motion for Leave to File Exhibits Under Seal (Doc. # 31) are hereby **granted**.

---

bending, standing, kneeling, and use of his hands.  *Id.*  Wad also stated that he could only walk "about 200 yards" before needing to stop and rest.  *Id.*  Furthermore, Wad's Social Security Determination form states that Wad was employed until March 10, 2017 "when he had a car accident and was no longer able to work."  (Doc. # 32-26).  Neither party has submitted evidence that Wad was involved in a car accident other than the previously-mentioned accident that occurred in 2014.  Wad's SSDI application was ultimately approved.  (Doc. # 38-1 at 74:17–19).

**B.    Motion for Summary Judgment**

**1.    Standard of Review**

Summary judgment is appropriate when the record reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine dispute of material fact exists where "there is sufficient evidence . . . for a jury to return a verdict for" the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The "moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  Once a party files a properly-supported motion for summary judgment, by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 250 (quoting FED. R. CIV. PRO. 56(e)).  However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." *Id*. at 252.

Because he is the non-moving party, the Court must "accept [Wad's] evidence as true and draw all reasonable inferences in his favor." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 255).  The Court is not permitted to "make credibility determinations" or "weigh the evidence when determining whether an issue of fact remains for trial." *Id*. (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001)).  For the court, "[t]he ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).  If there is a dispute

over facts that might affect the outcome of the case under governing law, then the entry of summary judgment is precluded.  *Anderson*, 477 U.S. at 248.

### 2.    *National-Origin Discrimination*

Wad brings two national-origin discrimination claims: a claim for national-origin discrimination "throughout his employment," and a claim for wrongful termination based on national-origin discrimination.  (Doc. # 1 at ¶¶ 69–88).  Absent evidence of direct discrimination,[3] the Court uses the *McDonnell Douglas* burden-shifting framework to evaluate claims of national-origin discrimination, including wrongful-termination claims under Title VII of the Civil Rights Act.  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (discussing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under the *McDonnell-Douglas* framework, a plaintiff must prove four elements as part of his prima facie case: (1) he is a member of a protected class, (2) he was qualified for his job, (3) he suffered an adverse employment decision, and (4) he was replaced by a person outside the protected class or treated differently than similarly-situated, non-protected employees.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also White*, 533 F.3d at 391.  "The burden of establishing a prima facie case" under *McDonnell Douglas* "is not onerous."  *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  If the plaintiff meets the prima facie case, then the "burden . . . shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  *McDonnell*, 411 U.S. at 802.  If the employer makes such a showing, then the plaintiff must prove that the defendant's proffered reasons for the adverse

---

[3]     Wad does not present direct evidence of discrimination.  *See generally* (Docs. # 1 and 37); *see also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (describing the difference between direct evidence of discrimination and circumstantial evidence of discrimination).

employment action are not the "true reasons" for its decision, but instead are merely a pretext for unlawful discrimination. *White*, 533 F.3d at 391–92.

The *McDonnell Douglas* burden-shifting framework, however, "should be understood in light of the plaintiff's ultimate and intermediate burdens." *Burdine*, 450 U.S. at 253. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* Here, Amazon admits that, as a Syrian-born immigrant over forty-years old, Wad is a member of protected classes based on his national-origin and age. *See* (Doc. # 32-1 at 17). However, Amazon argues that Wad cannot prove the three remaining elements of his prima facie case: (1) that he was qualified for his employment, (2) that he suffered an adverse employment action, and (3) that he was replaced by a person outside his protected class or treated differently than similarly-situated, non-protected employees. The Court will address each disputed element in turn.

### a.    Prima Facie Case—Qualified for Employment

To show that he was qualified for his past employment, a plaintiff "must prove that he was performing his job 'at a level [which] met his employer's legitimate expectations.'" *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990) (quoting *Huhn v. Koehring*, 718 F.2d 239, 243 (7th Cir. 1983)). Put another way, a plaintiff must present credible evidence that his "qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Wexler*, 317 F.3d at 575–76. Objective factors that the Court may consider include the employee's education, experience, and "demonstrated possession of the required general skills." *Id.* at 576.

However, "[e]mployees are generally estopped from making factual assertions in a civil suit that directly contradict factual positions taken before the Social Security Administration." *Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 430 (6th Cir. 2014) (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 802 (1999)). Thus, a plaintiff is generally estopped from claiming in a civil suit that he is qualified for employment if he has previously alleged in a SSDI application that he was disabled during the same time period. *Cleveland*, 526 U.S. at 806.[4] A plaintiff can survive a motion for summary judgment, however, if he provides a "sufficient explanation" for the "apparent contradiction that arises out of the earlier [social security] disability claim." *Id.*

The Court applies a two-step inquiry when deciding whether a plaintiff's prior statements to the Social Security Administration ("SSA") estop him from claiming he was qualified under *Cleveland*. First, the Court determines whether the plaintiff's statements in his employment-discrimination lawsuit are inconsistent with his SSDI application. *Isotalo*, 945 F. Supp.2d at 830. If the statements are inconsistent, then the plaintiff must provide an explanation "sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement," the plaintiff was nonetheless qualified for his job when he was terminated. *Cleveland*, 526

---

[4]     Although the plaintiff in *Cleveland* sued for wrongful termination under the Americans with Disabilities Act ("ADA"), *Cleveland* 526 U.S. at 797, the reasoning of *Cleveland* applies to claims for wrongful termination under Title VII of the Civil Rights Act and the Age Discrimination in Employment Act ("ADEA") as well, *see Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 142 (2d Cir. 2016) (applying *Cleveland* to Title VII and ADEA claims); *McClaren v. Morrison Mgmt. Specialists, Inc.*, 420 F.3d 457, 462 (5th Cir. 2005) (applying *Cleveland* to ADEA claims); *Detz v. Greiner Indus. Inc.*, 346 F.3d 109, 115–16 (3d Cir. 2003) (applying *Cleveland* to ADEA claims). While the Sixth Circuit has not directly addressed whether *Cleveland* applies to ADEA and Title VII claims, it has applied *Cleveland* to FMLA claims and approvingly cited cases that expand *Cleveland*'s scope. *See Verhoff*, 299 F. App'x at 498 (citing *Detz* with approval and applying *Cleveland* to FMLA claims); *see also Isotalo v. Kelly Servs. Inc.*, 945 F. Supp. 2d 825, 830 (E.D. Mich. 2013) (explaining in detail why *Cleveland* should apply to ADEA claims).

U.S. at 806.  Put another way, a plaintiff "cannot simply ignore [his] SSDI contention that [he] was too disabled to work" or "create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . without explaining the contradiction or attempting to resolve the disparity."  *Id.* at 798, 806; *see also Williams v. London Utility Comm'n*, 375 F.3d 424, 429 (6th Cir. 2004) (affirming the district court's grant of summary judgment when the plaintiff failed to explain how he became disabled the day after he was terminated).

Here, Amazon argues that Wad cannot prove that he was qualified for his position on the day he was terminated, March 10, 2017, because Wad also listed March 10, 2017 as the onset date of his disability in his SSDI application.  (Doc. # 32-1 at 17); (Doc. # 41 at 3–4).[5]  In response, Wad argues that he became disabled *after* he was terminated and that "the evidence demonstrates—by the sheer fact he was doing it—that Wad was fully capable of performing" his job responsibilities when he was terminated. (Doc. # 37 at 10–11).  After reviewing the evidence, however, the Court finds that Amazon is correct; Wad is estopped from claiming that he was qualified for his employment on the day he was terminated.

First, the Court finds that Wad's statements on his SSDI application and his statements in this action are inconsistent.   On March 9, 2018, Wad submitted his application for SSDI benefits, claiming that he stopped working on March 10, 2017

---

[5]      In its Reply, Amazon states that "the record confirms that *May* 10, 2017, is both the last day of [Wad's] Amazon employment and the onset date for his total disability."  (Doc. # 41 at 4) (emphasis added).  The rest of the record, however, makes clear that Wad's termination and onset of disability occurred on March 10, 2017.  *See* (Doc. # 32-23); (Doc. # 32-25).  Thus, the Court will not take seriously Amazon's claim that May 10, 2017 was the last day of Wad's employment and the onset date for his disability.  *See Berry v. Office of the Fayette Cty. Sheriff*, No. 5:14-cv-356-DCR, 2014 WL 6390174, at *2 (E.D. Ky. Nov. 14, 2014).

because of his "physical and/or mental conditions."  (Doc. # 32-25).  Wad stated that his conditions affected his lifting, bending, standing, kneeling, and use of his hands. *Id.*  Wad claimed that he could only walk "about 200 yards" before needing to stop and rest. *Id.*  In contrast, in his Complaint in this action Wad alleges that "[t]hroughout he employment, [he] was fully competent to perform the essential functions of his job," (Doc. # 1 at ¶¶ 70, 91), including on March 10, 2017, (Doc. # 37 at 2).  It is undisputed that as a Warehouse Associate Wad was required to, among other things, "pick customer orders on all levels of a multi-level mezzanine," "pack and ship customer orders," "stand and/or walk during shifts between 8 and 12 hours long," and "lift and move up to 60 pounds."  (Doc. # 32-3); (Doc. # 37 at 3).  Based on his statements on his SSDI application, however, it appears that Wad would not have been able to perform the physical requirements of his job starting on March 10, 2017.  *Compare* (Doc. # 32-25) (Wad's SSDI application), *with* (Doc. # 32-3) (Wad's Job Description).  Accordingly, the Court finds that Wad's statement in his SSDI Application that he was disabled beginning on March 10, 2017 is inconsistent with his claims in this lawsuit.

To survive a motion for summary judgment then, Wad must provide a sufficient explanation for the inconsistency.  *Cleveland*, 526 U.S. at 806.  Wad, however, fails to offer *any* explanation for the statements he made in his SSDI application. *See* (Doc. # 37 at 10–11).  Instead of addressing the inconsistency, Wad simply points to evidence in the record that appears to support his claim that he was qualified for his position when he was terminated. *See id.*  Wad cites to Human Resource Business Partner Casale's deposition, where she testified that she had no reason to believe that Wad "was not qualified for his job" and was not "aware of any duties Wad was not capable of performing

as a warehouse associate." (Doc. # 38-4 at 29:14–21). In contrast, in his own deposition, when asked whether he was "physically unable to do any job" on March 10, 2017, Wad replied that "[a]fter Amazon, yes, yes, after Amazon, yes." (Doc. # 38 at 248:14–20). Wad also affirmed that he "told the complete truth to the Social Security Administration," *id.* at 250:7–10, but did not explain how he could be both disabled for purposes of SSDI benefits and qualified for his job on the same day, *see id.* There is no evidence, for example, that Wad suffered a medical incident in the afternoon on March 10, 2017 after he was terminated that would have affected his physical ability to work.

In sum, Wad has provided no explanation that would enable a reasonable juror to conclude "that, assuming the truth of, or [Wad's] good-faith belief in, [his SSDI application], [Wad] could nonetheless perform the essential functions of [his] job" on March 10, 2017, the day he was terminated. *See Cleveland*, 526 U.S. at 807. Barring an adequate explanation, Wad is bound by his previous statement. *See id.* Accordingly, the Court finds that Wad cannot prove he was qualified for employment and fails to meet this element of his prima facie case.

### b.  Prima Facie Case—Adverse Employment Action

An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 798 (6th Cir. 2004) (en banc) (quoting *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)), *aff'd*, 548 U.S. 52 (2006). Here, Amazon admits that Wad was terminated on March 10, 2017, (Doc. # 32-1 at 11), which qualifies as an adverse employment action, *White*, 364 F.3d at 798. Thus, Wad

has satisfied the third element of his prima facie case.[6]

### c. Prima Facie Case—Replaced by Someone Outside the Protected Class

Finally, a plaintiff must demonstrate either that he was replaced by someone outside of the protected class or that "similarly situated non-protected employees were treated more favorably." *Minadeo v. ICI Paints*, 398 F.3d 751, 764 (6th Cir. 2005) (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002)). An employee "is replaced . . . when another employee is hired or reassigned to perform the plaintiff's duties." *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 267 (6th Cir. 2010) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)). An employee is not replaced if work is simply redistributed "among other existing employees already performing related work" or "when another employee is assigned to perform the plaintiff's duties in addition to other duties." *Id.*; *see also Mayhue v. Cherry St. Servs., Inc.*, 598 F. App'x 392, 402 (6th Cir. 2015).

Alternatively, a plaintiff may satisfy the fourth element of his prima facie case by showing that similarly-situated non-protected employees were treated more favorably than he was. Employees are similarly-situated when all relevant aspects of their employment situation are "nearly identical." *O'Donnell v. City of Cleveland*, 838 F.3d 718,

---

[6] While Amazon admits that Wad's termination is an adverse employment action, it disputes Wad's claim that Amazon's slow response to provide Wad with medical care following his November 10, 2016 workplace injury was also an adverse employment action as Wad argues. (Doc. # 32-1 at 17–18). Amazon claims that "no case has ever held alleged slow speed of assistance to be the basis for an adverse employment action." *Id.* at 18. Wad fails to respond to Amazon's argument. *See generally* (Doc. # 37). Because Wad's lack of response constitutes a waiver, *see Humphrey*, 279 F. App'x at 331, and because the Court agrees that an alleged slow response to provide medical care does not rise to the level of an adverse employment action based on this Circuit's precedent, to the extent that Wad's national-origin discrimination claims rely exclusively on his treatment on November 10, 2016 as the adverse employment action, the third element of the prima facie case is also not met.

727 (6th Cir. 2016) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).  "[E]mployees who engage in conduct of a qualitatively different nature or under materially different circumstances are not 'similarly situated' as a matter of law."  *Lattimore v. Wild Flavors, Inc.*, 2:09-cv-23-WOB-JGW, 2012 WL 208078, at *12 (E.D. Ky. Jan. 23, 2012) (collecting cases).  The employees must engage in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *see also Clayton*, 281 F.3d at 612 (holding that employees who engaged in the "same acts of negligence" were not similarly-situated because only the plaintiff's "negligence caused serious injury to a coworker").  In addition to the employees' conduct, other courts have considered whether the employees have the same supervisor and are subject to the same standards.  *O'Donnell*, 838 F.3d at 727. "Superficial similarities between a disciplined employee and his colleagues are not sufficient to show a *prima facie* case of discrimination."  *Arendale v. City of Memphis*, 519 F.3d 587, 604 (6th Cir. 2008).

Here, there is no evidence that Wad was replaced with someone outside of his protected class.  In fact, there is no evidence that Wad was replaced by anyone.  Amazon claims that it is impossible to know who replaced Wad because "hiring often occurs in bulk and work shifts and specific assignments depend on the needs of the facility from season to season."  (Doc. # 32-1 at 18).  Put another way, Amazon argues that no one replaced Wad because "new hires do not correlate to any individual positions."  (Doc. # 41 at 4).  Rather, it appears that the work Wad was doing has been "redistributed among other existing employees already performing related work."  *See Barnes*, 896 F.2d at

1465.  Wad has presented no evidence to dispute Amazon's claims.  *See* (Doc. # 37).

Instead of disputing Amazon's claim that Wad was not replaced by a specific employee, Wad argues that Amazon is not entitled to summary judgment precisely because "the company does not know who replaced him."  (Doc. # 37 at 12).  Wad claims that there remains a genuine dispute of material fact because Amazon has not proven that Wad was replaced by someone from his protected class.  *Id.*  Wad, however, misconstrues which party bears the burden of proof.  As the plaintiff, it is Wad's burden to *affirmatively prove* that he was replaced by someone outside the protected class; it is not Amazon's burden to prove that Wad was *not* replaced by someone outside the protected class.  *See McDonnell Douglas*, 411 U.S. at 802 ("The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case."); *Schoonmaker*, 595 F.3d at 264 (despite the *McDonnell* test, the ultimate burden of persuasion remains on the "plaintiff at all times" (quoting *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 177 (2009)).

Wad's bare allegations in his Complaint that "[Amazon] replaced [him] with someone outside his protected class," (Doc. # 1 at ¶¶ 79, 99, 107), are not enough to survive summary judgment when, after adequate time for discovery, he has failed to produce evidence to support his allegations.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (holding that summary judgment is warranted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case").  Accordingly, because Wad has not shown that another employee was hired or reassigned to fulfill his duties, Wad has not established that he was replaced by someone outside his protected class.  *See Schoonmaker*, 595 F.3d at 267.  Given the total lack of evidence

regarding who, if anyone, replaced Wad, no reasonable juror would be able to find that Wad was replaced by someone outside of his protected class.

Second, Wad has not demonstrated that he was treated differently than similarly-situated employees outside of his protected class. Wad argues that he was treated differently than Molnar because he was "terminated for purportedly violating Amazon's Workplace Violence Policy and Standards of Conduct, yet Molnar received no discipline for his involvement in that same altercation." (Doc. # 37 at 13). Wad's comparison fails, however, because Wad and Molnar are not similarly-situated. As an initial matter, Wad, a Warehouse Associate, and Molnar, a Loss Prevention Manager, had substantially different job responsibilities. *Compare* (Doc. # 32-3) (Wad's Job Description), *with* (Doc. # 41:2 at 17:5–15) (Molnar describing his job responsibilities). Furthermore, the security video, Frommeyer's deposition, and Wad's own admissions demonstrate that there is no genuine dispute that Wad and Molnar acted differently during the March 9, 2017 altercation. (Doc. # 32-21). In the security video, Wad is visibly more agitated than Molnar. *Id.* Wad points his finger at Molnar and several times tries to approach Molnar after the two men have separated. *Id.* At one point, Frommeyer, another coworker, steps in between the two men, and physically blocks Wad's path to Molnar. *Id.* Molnar, on the other hand, does not appear agitated in the video and does not appear to initiate conversation with Wad. *Id.*

The deposition testimony of Frommeyer, who was a work-friend of Wad, corroborates the security video. (Doc. 38-2). Frommeyer testified that Wad "was yelling," was "really aggressive," and "actually started going [] towards [Molnar]." *Id.* at 34:1–10. Frommeyer also recalled that Molnar "was a lot cooler than [Wad]." *Id.* at 34:14–15.

Frommeyer stated that Wad "was definitely being the aggressor at that time," when Molnar and Wad were near the security desk. *Id.* at 34:15–16. Additionally, in his Response to Amazon's Motion for Summary Judgment, Wad himself admits that he "yell[ed] at Molnar that Molnar needed to address him with respect." (Doc. # 37 at 7). Based on the security video, the deposition testimony, and Wad's own admissions, there is no genuine dispute of fact that Molnar's and Wad's conduct was not the same on March 9, 2017. Regardless of what the two men did out of view of the camera, their conduct captured on video shows "differentiating or mitigating circumstances that [could] distinguish . . . [Amazon's] treatment of them." *Mitchell*, 964 F.2d at 583. Thus, Wad and Molnar are not similarly-situated in all relevant aspects, and Wad cannot rely on their different treatment after the March 9, 2017 altercation to prove his prima facie case.

In sum, Wad fails to meet two elements of his prima facie case: that he was qualified for his employment on the day he was terminated and that he was replaced by or treated differently than similarly-situated nonprotected employees. Because no reasonable juror could find that Wad has met his prima facie case of national-origin discrimination, the Court need not address steps two and three of the *McDonnell Douglas* burden-shifting framework. Accordingly, Amazon's Motion for Summary Judgment in regard to Wad's national-origin discrimination claims is **granted**.

### 3. *Age Discrimination*

Like Wad's national-origin discrimination claims, Wad's age-discrimination claims under the ADEA are also subject to the *McDonnell Douglas* burden-shifting framework. *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 940 (6th Cir. 1987). To satisfy his prima facie case at the first step of *McDonnell Douglas*, Wad must prove that: (1) he was a

member of a protected class, (2) he was subjected to an adverse employment action, (3) he was qualified for his position, and (4) he was replaced by a younger person or treated differently than similarly-situated younger employees. *Id.* For the reasons previously stated, Wad cannot prove that he was qualified for his position or that he was replaced by a younger person.[7] *See supra*. Accordingly, Amazon's Motion for Summary Judgment as to Wad's age-discrimination claims is also **granted**.

### 4. *Intentional Infliction of Emotional Distress*

In addition to his claims of unlawful employment discrimination, Wad also brings a claim for IIED. (Doc. # 1 at ¶¶ 121–25). A plaintiff must prove four elements to succeed on an IIED claim in Kentucky:[8] (1) that the wrongdoer's conduct was intentional or reckless, (2) that the conduct was outrageous and intolerable, (3) that there was a causal connection between the wrongdoer's conduct and the emotional distress, and (4) that the emotional distress was severe. *Craft v. Rice*, 671 S.W.2d 247, 249 (Ky. 1984) (citing *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974)). Here, Wad's IIED claim fails for

---

[7] In his deposition, Wad testified that he was replaced by "someone young." (Doc. # 38-1 at 313:7–9). Wad admitted, however, that he did not know his replacement's name, had not communicated with Amazon since he was terminated, and could not remember how he learned that his replacement was younger than he was. *Id.* at 313–14. Wad does not mention whether his alleged replacement was also of Syrian-descent. *See id.* Because no reasonable juror could find that Wad was replaced by someone outside his protected class based solely on his self-serving, unsupported claim that he was replaced by "someone young," Wad's deposition testimony does not preclude the entry of summary judgment against him. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."); *see also L.F.P.IP, LLC v. Hustler Cincinnati, Inc.*, 533 F. App'x 615, 620–21 (6th Cir. 2013) ("[U]nsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." (alteration in original) (internal quotations omitted) (quoting *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985)).

[8] Both parties agree that Kentucky law governs Wad's IIED claim, *see* (Doc. # 32-1 at 27); (Doc. # 37 at 21), and the Court concurs. Under Kentucky choice-of-law rules, Kentucky law applies to tort cases when there are significant contacts with Kentucky. *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972). Such contacts exist here.

two reasons: Amazon's conduct was not extreme and outrageous and Wad has not proven that his emotional distress was severe.

### a.    Extreme and Outrageous Conduct

Conduct is only actionable under the tort of IIED if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 789 (Ky. 2004) (quoting RESTATEMENT (SECOND) OF TORTS § 46(a) cmt. d)), *overruled on other grounds by Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014).   "[I]nsults, indignities, threats, annoyances, petty oppression, [and] other trivialities" are insufficient.  *Id.*

In the employment-law context, "[m]ere termination [of employment] clearly does not rise to the level of outrageous conduct required to support an IIED claim." *Benningfield v. Pettit Environ., Inc.,* 183 S.W.3d 567, 572 (Ky. Ct. App. 2005); *see also Highlands Hosp. Corp. v. Preece*, 323 S.W.3d 357 (Ky. Ct. App. 2010).  Furthermore, even when termination is based on discrimination, it still "does not rise to the level of 'extreme and outrageous conduct'" sufficient to support a claim for intentional infliction of emotional distress.  *Benningfield*, 183 S.W.3d at 572 (citing *Godfredson v. Hess & Clark, Inc.,* 173 F.3d 365, 376 (6th Cir. 1999)); *see also Highlands Hosp. Corp*, 323 S.W.3d at 368.   Instead, courts are more likely to find that an employer acted extremely and outrageously when the plaintiff was repeatedly harassed at work.  *See, e.g.*, *Wilson v. Lowe's Home Center*, 75 S.W.3d 229, 239 (Ky. Ct. App. 2001) (holding that a jury could find IIED when the plaintiff "was subjected to racial remarks on nearly a daily basis by his coworkers and supervisors for a period of approximately seven years"), *superseded on*

*other grounds by Owen v. Univ. of Kentucky*, 486 S.W.3d 266 (Ky. 2016); *Brewer v. Hillary*, 15 S.W.3d 1, 6–7 (Ky. Ct. App. 1999) (The court "[had] no trouble finding" that the employer's conduct was "outrageous and intolerable to the point of being actionable" when the plaintiff "was subjected to frequent incidents of lewd name calling coupled with multiple unsolicited and unwanted requests for homosexual sex.").

Here, even when construed in the light most favorable to Wad, Amazon's conduct does not come close to the level necessary to merit an IIED claim. Wad appears to argue that Amazon's conduct was extreme and outrageous because he was "targeted, verbally affronted, and terminated due to his national origin and age." (Doc. # 37 at 21). Even if Wad's allegations are true, however, Amazon's conduct was not extreme and outrageous. Wad does not claim that he was subjected to the type of prolonged, severe harassment that other courts have deemed extreme and outrageous. *See, e.g.*, *Wilson*, 75 S.W.3d at 239. Instead, Wad alleges that he was harassed one time by an Amazon employee and that he was then wrongfully terminated. This does not qualify as extreme and outrageous conduct under the law. *See Benningfield*, 183 S.W.3d at 572 (finding wrongful termination insufficient to sustain an IIED claim); *Stringer*, 151 S.W.3d at 769 (finding that mere insults are insufficient). Put another way, the Court finds that "an average member of the community" would not "exclaim, 'outrageous!'" after hearing what Amazon allegedly did to Wad. *Stringer*, 151 S.W.3d at 769. Accordingly, Amazon's conduct was not extreme and outrageous.

### b. Severity of Emotional Distress

Wad's IIED claim also fails for a second reason—Wad has not demonstrated that his emotional distress was severe. To prevail on an IIED claim, the plaintiff must show

that he suffered a severe emotional injury, meaning an injury that "a reasonable person, normally constituted, would not be expected to endure." *Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012). Distress that does not significantly affect the plaintiff's "everyday life or require significant treatment will not suffice." *Id.* A plaintiff cannot simply rely on his own testimony to demonstrate that his emotional injury was severe; he "must present expert medical or scientific proof to support the claimed injury or impairment." *Id.* at 18.

Here, no reasonable jury could find that Wad's emotional injuries were severe based on the evidence before the Court. The only evidence that Wad provides to support his claim of severe emotional distress is his own deposition testimony. *See* (Doc. # 37 at 21–22). While the Court is sympathetic to Wad's testimony that he has been unable to sleep, work, or receive proper medical care since his termination, *see id.*, Wad's claim cannot survive on his word alone, *see Osborne*, 399 S.W.3d at 17–18. Wad has not provided any independent evidence, such as expert or scientific report, to support the severity of his emotional distress. Thus, Wad has not met his burden of proof. *See id.* Accordingly, because Amazon's conduct was not extreme or outrageous and Wad has failed to show that his emotional distress was severe, Amazon's Motion for Summary Judgment as to Wad's IIED claim is **granted**.

### 5. FMLA Claim

Finally, Amazon asks for summary judgment at to Wad's FMLA claim. (Doc. # 32-1 at 23–27). In his Complaint, Wad alleges that Amazon "unlawfully interfered with [his] exercise of [his] rights under the FMLA." (Doc. # 1 ¶ 117). In his Response to Amazon's Motion for Summary Judgment, however, Wad concedes that he "cannot provide any evidence to demonstrate [Amazon] denied him the FMLA benefits to which

he was entitled." (Doc. # 37 at 21). Wad must show that Amazon denied him FMLA benefits to which he was entitled to establish his prima facie case under the FMLA. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012). Because Wad admits that he has no evidence to prove an essential element of his prima facie case, Amazon's Motion for Summary Judgment as to Wad's FMLA claim is **granted**.

## III. CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)     Defendant Amazon.com Services, Inc.'s Motion for Summary Judgment (Doc. # 32) is **GRANTED**;

(2)     Defendant Amazon.com Services, Inc.'s Motion for Leave to Exceed Page Limit (Doc. # 30) is **GRANTED**;

(3)     Defendant Amazon.com Services, Inc.'s Motion for Leave to File Exhibits Under Seal (Doc. # 31) is **GRANTED**;

(4)     This matter is dismissed and stricken from the Court's active docket; and

(5)     A corresponding Judgment will be issued contemporaneously herewith.

This 4th day of March, 2020.



Signed By:
*David L. Bunning*
United States District Judge

J:\DATA\Memorandum\CovCivil\18-97 Wad v. Amazon.com.docx